**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| Northfield LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>Onchainweb3, a general partnership; Ava Lee; the Binance Off-Ramp Defendant; and John Does 1 – 20,<br><br>*Defendants*. | Case No. 1:26-cv-00092<br><br>**Complaint** |

Plaintiff Northfield LLC hereby sues Onchainweb3, Ava Lee, the Binance Off-Ramp Defendant, and John Does 1 – 20 (collectively, the "Defendants"). In support, it alleges as follows.

## I. Preliminary Statement

1. Our country is in the midst of a crypto-fraud crisis. Foreign criminal organizations have stolen billions of dollars from hardworking Americans in what are known as "pig-butchering scams"—and are continuing to do so even as we speak. These schemes are not isolated incidents or amateur swindles. They are industrialized, transnational fraud operations that rely on scripted psychological manipulation, sophisticated online

infrastructure, and extensive money-laundering networks to extract enormous sums from victims while evading detection and recovery.

2. Although the particulars vary from case to case, the structure of these schemes is strikingly consistent. Scammers initiate contact with victims—usually through social media, messaging applications, or dating platforms—and cultivate trust over weeks or months using carefully designed social-engineering techniques. Once trust is established, victims are induced to "invest" through realistic-looking online cryptocurrency platforms that falsely display fabricated profits. As victims are encouraged to deposit ever-larger amounts of money, the illusion of legitimate investment success deepens. When victims attempt to withdraw their funds, they are met with manufactured obstacles—purported taxes, fees, or compliance requirements—designed to extract still more money. Ultimately, when victims can no longer pay or begin to question the scheme, the perpetrators abruptly sever communications and abscond with the victims' assets.

3. Tens of thousands of Americans have lost their life savings to pig-butchering scams. Recent academic research and law-enforcement reporting indicate that pig-butchering organizations have stolen more than **$75 billion** worldwide since 2020. According to the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3), American victims reported approximately $9.3 billion in losses from cryptocurrency investment fraud in 2024, a figure that reflects only reported complaints and is widely

believed to understate actual harm. Globally, blockchain analytics firm Chainalysis estimates that crypto-related scams and fraud extracted between $14 billion and $17 billion from victims in 2025, the highest annual figure on record and a continuing upward trend driven by increasingly sophisticated social-engineering and AI-enabled tactics. These figures underscore the scale, organization, and escalating financial impact of pig-butchering and related schemes on U.S. consumers.

4. This action arises from an archetypical pig-butchering scam. The Defendants tricked the victim into investing on a platform that turned out to be a scam, and in so doing stole $1,441,904 of the victim's savings. The victim has now been "slaughtered," in the scammers' parlance, and the stolen money spirited away to foreign bank accounts and crypto wallets.

5. This action and coordination with law enforcement are the victim's only hopes for recovery. This suit seeks the return of the assets stolen by the Defendants and additional relief described below.

## II. Parties

6. Plaintiff Northfield LLC is a Texas limited liability company. Its principal place of business is 268 Pearl St, Beaumont, TX 77701. Plaintiff has standing to bring this action as it is the assignee of all of the causes of action accrued by the victim of the scam described herein (the "Victim").

7. Onchainweb3 is a fraudulent cryptocurrency-investment platform operating as a general partnership. Its headquarters and situs of

organization lie outside the United States, although the precise locations from which it carries out its operations are presently unknown.

8. Ava Lee is an individual of foreign citizenship whose present whereabouts are unknown.

9. The Binance is a recipient of the assets misappropriated from the victim in this case. The Binance is a foreign individual or entity whose present whereabouts and citizenship are unknown.

10. John Does 1 – 20 are as-yet-unidentified coconspirators who supported and participated in the scam giving rise to this action.

**III. Jurisdiction & Venue**

11. This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Accordingly, this Court has federal-question jurisdiction.

12. This Court has personal jurisdiction over Defendants pursuant to RICO and consistent with the Due Process Clause of the Fifth Amendment. RICO authorizes nationwide service of process, and where, as here, a federal statute provides for such service, the relevant constitutional inquiry is whether Defendants have sufficient aggregate contacts with the United States as a whole, not with any single state.

13. The Defendants purposefully directed their conduct at the United States by targeting U.S. residents, inducing the transfer of funds from U.S.-based accounts, utilizing U.S.-based cryptocurrency infrastructure and internet services, and causing substantial harm within the United States.

Exercising personal jurisdiction over Defendants therefore comports with traditional notions of fair play and substantial justice, and is reasonable under the Supreme Court's flexible due-process framework applicable to federal statutes providing for nationwide service of process.

14. In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). This action arises under federal law, Defendants are not subject to the personal jurisdiction of any single state's courts, and Defendants have sufficient contacts with the United States as a whole to satisfy due process. Accordingly, the exercise of jurisdiction under Rule 4(k)(2) is proper.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3), which provides that a foreign defendant may be sued in any judicial district.

## IV. Background

16. Pig-butchering scams are a recognized and extensively documented form of organized investment fraud. This section describes the defining characteristics of these schemes, including their origin, structure, and reliance on cryptocurrency and online infrastructure, as established by law-enforcement agencies, regulators, and academic research.

### A. Definition & Origin of Pig-Butchering Scams

17. The fraud scheme commonly referred to as "pig butchering" is a well-recognized form of cyber-enabled investment fraud that combines elements of social-engineering, relationship-based manipulation, and

fictitious investment platforms. The term derives from the Chinese phrase Shā Zhū Pán (杀猪盘), which translates literally to "killing the pig," and is used to describe a process by which victims are deliberately cultivated over time before being financially exploited.

18. Pig-butchering scams are characterized not by a single deceptive act, but by a structured, multi-stage process. Perpetrators initiate contact with victims through online channels such as social-media platforms, messaging applications, or dating services, often under false identities. Over time, the perpetrators build rapport and trust with victims through sustained communication, shared narratives, and carefully scripted interactions. Only after this trust has been established do perpetrators introduce purported investment opportunities, most frequently involving cryptocurrency.

19. Law-enforcement agencies and regulators in the United States have formally recognized pig-butchering schemes as a distinct and prevalent fraud typology. The Federal Bureau of Investigation ("FBI"), through its Internet Crime Complaint Center ("IC3"), has repeatedly warned that cryptocurrency investment fraud—of which pig-butchering is a major component—has become the leading source of reported financial losses among all categories of cybercrime. Similarly, the Financial Crimes Enforcement Network ("FinCEN") has issued alerts identifying pig-butchering as a widespread and organized form of virtual-currency investment fraud.

20. Academic researchers have likewise studied pig-butchering scams as a discrete and repeatable fraud model. Scholarly literature describes these schemes as "hybrid" investment frauds that merge techniques commonly associated with romance scams, confidence fraud, and financial deception into a single operational framework. This research emphasizes that pig-butchering scams are not opportunistic or ad hoc, but instead follow standardized methods that are reused across victims, platforms, and jurisdictions.

21. As described in these law-enforcement and academic sources, pig-butchering scams are best understood as a system of fraud rather than a series of isolated incidents. The defining feature of the scheme is the intentional "fattening" of victims—psychologically and financially—through prolonged engagement, escalating investment prompts, and the illusion of legitimate profit, followed by the rapid misappropriation of the victims' funds once withdrawal is attempted or skepticism arises.

### B. Organizational and Industrial Nature of Pig-Butchering Operations

22. Pig-butchering scams are not carried out by individual opportunists acting alone. Instead, they are operated by organized groups that employ standardized processes, division of labor, and centralized coordination to target large numbers of victims simultaneously. Law-enforcement investigations and academic research consistently describe

these schemes as enterprise-level operations capable of sustaining fraud across jurisdictions and over extended periods of time.

23. These operations typically involve distinct functional roles. Some participants are responsible for initiating contact with victims and maintaining ongoing communications using scripted social-engineering techniques. Others manage the technical infrastructure used to create and operate fraudulent investment platforms, including websites and mobile applications that falsely display account balances and purported profits. Additional participants oversee the receipt, movement, and aggregation of victim funds, often through cryptocurrency wallets and exchange accounts. This specialization allows the enterprise to scale efficiently while insulating the scams' bosses, software developers, and money-laundering specialists from direct contact with victims.

24. Pig-butchering organizations rely heavily on pre-written scripts, training materials, and operational playbooks. Academic studies and investigative reporting have documented the use of standardized messaging templates tailored to different victim profiles, including variations based on age, gender, geographic location, and perceived financial capacity. These scripts are designed to cultivate emotional trust, reinforce perceived legitimacy, and gradually escalate financial commitments over time.

25. The organizational structure of pig-butchering schemes also enables continuity. When a particular wallet address, online persona, or

fraudulent platform is exposed, operators are able to rapidly substitute new infrastructure while maintaining the same underlying methods and personnel. This adaptability allows the enterprise to persist even as individual components are identified or disrupted, and contributes to the repeatable and ongoing nature of the fraud.

26. Law-enforcement and regulatory authorities have further reported that many pig-butchering operations are transnational in scope, with participants, infrastructure, and financial flows spanning multiple countries. These schemes frequently exploit global internet services, cross-border financial systems, and cryptocurrency networks to reach victims in the United States while operating largely outside the victims' physical jurisdictions.

### C. Reliance on Cryptocurrency and Online Infrastructure

27. Pig-butchering scams rely heavily on cryptocurrency and internet-based infrastructure to facilitate both the execution and concealment of fraudulent activity. Cryptocurrency enables perpetrators to receive and move large sums of value rapidly, across borders, and with a degree of pseudonymity that is difficult for individual victims to penetrate without legal process. As a result, cryptocurrency has become a central tool in the operation and scaling of pig-butchering schemes.

28. In a typical pig-butchering operation, victims are directed to transfer funds to specific cryptocurrency wallets or accounts designated by

the perpetrators. These wallets are often presented to victims as part of legitimate trading platforms or investment accounts, even though the platforms themselves are fictitious or controlled entirely by the fraud enterprise. The appearance of legitimate account balances and trading activity is generated through manipulated platform interfaces rather than actual market participation.

29. To manage volume and liquidity, pig-butchering operations commonly route victim funds through centralized cryptocurrency exchanges, custodial services, or other third-party infrastructure providers. These intermediaries play a functional role in the fraud ecosystem by enabling the aggregation, storage, conversion, and onward transfer of misappropriated assets. The use of such services allows perpetrators to consolidate funds from multiple victims and to move assets through successive layers of accounts.

30. The design of these schemes prioritizes speed and dissipation. Once funds are transferred by victims, perpetrators often move the assets quickly through multiple wallets or accounts in an effort to frustrate tracing and recovery. This rapid movement increases the risk that stolen assets will be irretrievably lost unless prompt investigative and legal measures are taken.

31. Because pig-butchering scams depend on identifiable cryptocurrency transactions and the use of centralized infrastructure at key stages, blockchain analysis and legal process directed to service providers are

critical tools for identifying the flow of stolen assets and preserving them for potential recovery. Courts are therefore routinely called upon to evaluate requests for asset preservation and expedited discovery in cases involving this form of fraud.

## V. Application of Pig-Butchering Framework to Victim's Experience

32. The events giving rise to this action reflect the same sequence of conduct, methods, and structural features that characterize pig-butchering schemes as described above. The following factual allegations illustrate how those features manifested in the victim's experience.

### A. Initial Contact & Grooming of Victim

33. On or around April 4, 2025, Victim was approached via WhatsApp by an individual identifying herself as Ava Lee. Victim was informed by Lee that she was employed as an assistant at Morgan Stanley. During these initial communications, Lee introduced herself in a professional manner and quickly established rapport with Victim by advertising a trading group purportedly led by a cryptocurrency trading expert named Emily Claire Richardson. Lee promoted the group as offering exclusive cryptocurrency trading signals tailored for interested investors and emphasized the professional nature and exclusivity of the group to encourage Victim's participation.

34. As the communications continued, Lee consistently represented herself as a credible financial intermediary with institutional backing. She

maintained regular contact with Victim, seeking to earn her trust through repeated reassurances about the legitimacy and sophistication of both the group and its lead trader, Emily Richardson. The relationship evolved over the course of several days, with Lee positioning herself as both a knowledgeable guide and a conduit to a select investment opportunity, thus fostering Victim's confidence in the opportunity Lee was presenting.

**B. Introduction of the 'Investment Platform'**

35. On or around April 11, 2025, Lee directed Victim through the process of establishing accounts with various cryptocurrency exchanges, including Crypto.com and Coinbase. Lee instructed Victim in the use of the Crypto.com Onchain in-app browser, through which Victim was introduced to the onchainwallet.vip decentralized application—subsequently connecting her to what was represented as the Onchainweb3.net trading platform. Lee explained that access to this trading platform was necessary to participate fully in the purported VIP trading group and that a minimum account balance would have to be maintained to qualify for entry.

36. Victim followed Lee's detailed instructions and transferred an initial deposit of approximately $50,000. Lee offered to enroll Victim in a higher-tier commission plan, the so-called "VIP 10x commission plan," which included additional exclusive trading signals. Lee also introduced Victim to the requirement of paying a commission fee to Richardson, which could not come from Victim's account balance but instead had to be paid separately. After these steps, Victim observed her account on Onchainweb3.net reflect

significant returns, with her displayed balance apparently increasing into seven figures, thereby reinforcing the impression that her investments were yielding extraordinary gains.

### C. Escalation of Deposits & Directed Transfers

37. Having witnessed what appeared to be remarkable returns in her trading account, Victim was systematically induced by Lee to make progressively larger deposits over several months. Lee exploited Victim's growing confidence by urging her to increase her investments to maximize her apparent profits and to ensure continued participation in the lucrative trading program. At Lee's direction, Victim used her accounts at Coinbase, Crypto.com, and other financial institutions to fund her Onchainweb3.net account. Over time, her deposits expanded in scope and magnitude, ultimately totaling $1,492,565.

38. Throughout this period, Victim was urged to act swiftly to take advantage of trading opportunities and to retain eligibility for VIP trading status and additional commissions. The psychological manipulation involved frequent reference to the substantial "gains" exhibited in her online account and the purported urgency of maintaining minimum balances and paying required fees. At multiple intervals, Lee continued to reference Victim's rapidly accruing earnings and the advantages of remaining in the VIP group as inducements for continued and escalating investment.

### D. Attempted Withdrawal & Loss of Funds

39. On or around April 30, 2025, Victim attempted to withdraw funds from her Onchainweb3.net account. She was promptly informed that her withdrawal could not be processed unless she first paid a series of additional fees. Lee and representatives of the scheme described these mandatory charges as relating to increased "computing power," compliance with anti-money-laundering protocols, miner fees, and special repeat transaction fees. Victim diligently complied, paying each of the required fees with the understanding that they were temporary procedural necessities to access her funds.

40. Despite paying these substantial additional sums, Victim's attempted withdrawal was subjected only to an indefinite "pending" status. Explanations offered by Lee included further justifications for new charges and repeated assurances that each subsequent fee would resolve the holding of her funds. Over the ensuing months, Victim paid over $1 million in additional "fees," all at the instruction of Lee and other representatives involved with the trading platform. Nevertheless, Victim was never able to access her funds. On or around October 21, 2025, Victim discovered an online Reddit thread referencing both Ava Lee and Emily Richardson in the context of known cryptocurrency scams. Faced with this revelation and her inability to recover any of her funds, Victim realized she had been defrauded and subsequently sought legal recourse.

### E. Representative Misrepresentations Made to the Victim

41. The false statements underlying the scheme included multiple misrepresentations regarding personal identity and credentials. Ava Lee presented herself as an assistant at Morgan Stanley, thereby cloaking herself in the veneer of legitimacy and financial sophistication. Similarly, the individual known as Emily Claire Richardson was introduced as a cryptocurrency trading expert with the authority to provide lucrative trading signals and to command high commission fees for access to her expertise, though neither her qualifications nor her identity were genuine.

42. The legitimacy of the trading platform itself, Onchainweb3.net, was continually misrepresented by Lee and her associates. The platform was presented as an exclusive, technologically advanced system capable of rapid trading yields and designed for institutional-level investors. Victim was assured that she was participating in a genuine, secure, and professionally managed trading operation, whereas in reality the platform was fraudulent.

43. Lee and others boldly misrepresented the likely returns on Victim's investments. She was shown screen displays indicating profits exceeding $1 million on her deposited principal. Repeated assurances were made that these gains were real, locked in, and immediately available for withdrawal, which induced Victim to continue making escalating deposits under false pretenses.

44. Finally, the conditions for withdrawal and the imposition of various fees were systematically falsified. Victim was told that she must pay fees for withdrawal channel unblocking, computing power increases, anti-money-laundering checks, and other pretexts before she could access her funds. Each new fee was claimed to be a mandatory regulatory or technical requirement, designed solely to induce further payments on the false promise that her funds would then be released.

## VI. Tracing & Movement of Misappropriated Assets

45. This section describes the movement of the Victim's misappropriated cryptocurrency assets from the initial transfers induced by the fraud through subsequent transactions on the blockchain, including transfers through wallets and centralized cryptocurrency services associated with the Defendants.

### A. Transfers of Cryptocurrency from the Victim

46. In reliance on the misrepresentations described above, the Victim transferred cryptocurrency to wallet addresses designated by the perpetrators and presented as associated with the purported investment platform. These transfers were made over a defined period and consisted of multiple transactions of increasing value.

47. Each transfer was initiated by the Victim from cryptocurrency wallets under the Victim's control and was directed to specific destination wallet addresses provided by the perpetrators. The Victim understood these transfers to constitute deposits into a legitimate investment account. In

reality, the transfers resulted in the permanent relinquishment of control over the cryptocurrency to the fraud enterprise.

### B. Blockchain Tracing of the Stolen Assets

48. Blockchain analysis performed after discovery of the fraud identified the movement of the Victim's cryptocurrency from the initial destination wallets through a series of subsequent transactions. Because cryptocurrency transactions are recorded on public blockchains, the flow of funds could be traced despite the perpetrators' use of pseudonymous wallet addresses.

49. The tracing analysis demonstrated that the destination wallets provided to the Victim were not independent investment accounts but were instead aggregation wallets used to receive funds from multiple victims. From these wallets, the cryptocurrency was rapidly transferred to additional wallets in patterns consistent with laundering and concealment.

50. The movement of funds followed a repeatable structure commonly observed in pig-butchering schemes. Specifically, blockchain tracing revealed the following.

51. During the scheme, Victim transferred a total of approximately $1,441,904.41 in cryptocurrency to addresses and wallets controlled by defendants. Blockchain analysis has traced these funds through a series of cryptocurrency addresses, many of which were linked to major exchanges, particularly Binance. Additional flows were identified to a wallet at HTX and to the Hyperliquid exchange.

52. On review, every traced asset transfer was consistent with funds being quickly moved from Victim's accounts to destinations outside her control and commingled with other illicit proceeds on exchange platforms. Each step in the flow of funds further distanced Victim from her assets, culminating in the irretrievable loss of over $1.44 million as a direct result of the defendants' conduct.

### C. Transfers through Centralized Exchanges & Custodial Services

53. Tracing analysis further revealed that a substantial portion of the Victim's cryptocurrency was transferred from intermediary wallets to accounts held at centralized cryptocurrency exchanges and custodial service providers. These services enable the storage, conversion, and withdrawal of cryptocurrency and serve as critical exit points for fraud proceeds.

54. The transfers into these services were identifiable through on-chain transaction data and corresponded to known deposit addresses associated with specific platforms. Once deposited, the assets were commingled with other funds and became subject to the internal account controls of the custodial providers.

55. The use of centralized exchanges and custodial services allowed the Defendants to convert, transfer, or withdraw stolen assets in a manner that would be difficult or impossible for individual victims to prevent without timely judicial intervention.

### D. Dissipation Risk and Need for Prompt Asset Preservation

56. The tracing analysis showed that the stolen assets were moved rapidly after receipt and continued to be transferred through multiple wallets and platforms. This pattern reflects a deliberate effort by the Defendants to dissipate and conceal the proceeds of fraud and substantially increases the risk that the assets will be irretrievably lost.

57. Because cryptocurrency transactions are irreversible and because custodial platforms may permit rapid withdrawal or conversion absent legal restraint, delays in investigation or court-ordered relief materially reduce the likelihood of recovery.

58. Courts addressing pig-butchering and similar cryptocurrency fraud schemes have recognized that early asset tracing, preservation orders, and expedited discovery are essential to prevent irreparable harm to victims and to preserve the possibility of restitution.

### E. Connection Between Traced Assets and Defendants

59. The wallets, accounts, and infrastructure through which the Victim's assets were transferred are associated with the Defendants and/or entities that provided services integral to the operation of the fraud scheme. These services enabled the receipt, aggregation, storage, and movement of stolen assets and were necessary to the scheme's success.

60. The tracing evidence establishes a direct causal link between the Defendants' fraudulent conduct, the Victim's cryptocurrency transfers, and

the subsequent movement of those assets through identifiable wallets and service providers. This chain of transactions confirms that the Victim's losses were the foreseeable and intended result of the scheme.

## VII. Defendants' Roles & Participation in the Fraudulent Scheme

61. The fraudulent scheme described above depended on the coordinated participation of multiple Defendants, each of whom performed a distinct and essential role. As alleged herein, each Defendant knowingly engaged in conduct that furthered the scheme and was necessary to its success.

### A. Ava Lee — The Groomer and Social-Engineering Operator

62. Ava Lee acted as the primary groomer and social-engineering operator in the scheme. Ava Lee initiated contact with the Victim, maintained ongoing communications over messaging applications, and made the misrepresentations that induced the Victim to transfer cryptocurrency.

63. Using a fabricated identity and false personal background, Ava Lee cultivated trust through sustained interaction, personal disclosures, and representations of financial sophistication. Ava Lee controlled the pacing of the scheme, including when investment discussions were introduced and when additional transfers were solicited.

64. Ava Lee directed the Victim to use the purported trading platform operated by Onchainweb3 and provided instructions regarding how and where cryptocurrency should be transferred. Ava Lee further conveyed

false assurances regarding profits, account balances, and the Victim's ability to withdraw funds.

65. This conduct is consistent with the role of groomers in pig-butchering schemes as documented in academic literature and law-enforcement reporting, which describe groomers as frontline operators responsible for inducing victim transfers while remaining insulated from the receipt and laundering of funds.

**B. Onchainweb3 — Operator of the Fraudulent Trading Platform**

66. Onchainweb3 operated, controlled, or materially supported the purported cryptocurrency trading platform used in the scheme. This platform was presented to the Victim as a legitimate investment service but was, in reality, a fictitious or controlled environment designed to simulate trading activity and display fabricated profits.

67. The platform operated by Onchainweb3 served as the central mechanism by which the scheme created the illusion of legitimacy. Its interfaces, dashboards, account balances, and transaction histories were designed to induce reliance, encourage additional deposits, and delay detection of the fraud.

68. Onchainweb3 did not engage in genuine market trading on behalf of the Victim. Instead, the platform's reported activity was illusory and functioned to reinforce the misrepresentations made by Ava Lee, including false claims regarding profitability and withdrawability.

69. The use of a controlled or fictitious trading platform in this manner is a defining feature of pig-butchering schemes and is repeatedly documented in academic research and law-enforcement analyses. Onchainweb3's platform performed precisely this role here.

### C. The Off-Ramp Defendants — Money Laundering and Exchange Off-Ramp Account(s)

70. The Binance Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route the Victim's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the Binance Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of the Victim's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $1,366,416 of the Victim's assets were transferred to accounts controlled by the Binance Off-Ramp Defendant. By knowingly receiving, holding, converting, and transferring these fraud proceeds, the Binance Off-Ramp Defendant directly facilitated the monetization and dissipation of the Victim's losses.

### D. Coordinated and Interdependent Conduct

71. The Defendants' conduct was coordinated and interdependent. Each Defendant performed a specialized function that complemented the others and advanced the common objective of defrauding the Victim.

72. Ava Lee induced the transfers, Onchainweb3 sustained the illusion of legitimate investment activity, and the Binance Off-Ramp Defendant converted and off-ramped the stolen assets and controlled the fraud proceeds.

73. These actions reflect a deliberate division of labor consistent with organized pig-butchering schemes and demonstrate knowing participation in a common plan that directly caused the Victim's losses. Defendants did not merely receive cryptocurrency incidentally or passively. Each Defendant knowingly agreed to perform a specific function within the scheme and undertook affirmative acts in furtherance of that role. These acts included placing accounts or wallet infrastructure at the disposal of the scheme, exercising discretion over the receipt and movement of funds, and repeatedly performing the same functions as part of an ongoing operation.

### VIII. Evidence of Multiple Victims and Ongoing Fraudulent Activity

74. The fraudulent conduct described above was not limited to the Victim or to a single, isolated incident. Blockchain tracing and analysis of transactions associated with Defendants' wallet addresses and exchange accounts reveal that Defendants received cryptocurrency from numerous additional sources consistent with victim transfers in similar fraud schemes.

75. Backward tracing of transactions flowing into wallet addresses and exchange accounts controlled by the Defendants shows repeated deposits originating from multiple U.S.-based cryptocurrency exchanges and other

sources associated with individual retail accounts, rather than a single origin or legitimate business activity.

76. These incoming transactions occurred over an extended period exceeding one year, with substantial amounts transferred at regular intervals. The volume, timing, and structure of these transactions are inconsistent with ordinary investment activity and are consistent with the aggregation of proceeds from multiple fraud victims.

77. The traced transactions include deposits traceable to accounts at U.S.-based exchanges commonly used by individual consumers, indicating that the scheme affected multiple victims located in the United States, not solely the Victim in this action.

78. The repeated receipt of funds from different sources, across different exchanges, and over a prolonged period demonstrates that Defendants' conduct was part of a continuing course of fraudulent activity, rather than a single completed act. The same wallet addresses, exchange accounts, and laundering pathways were reused to process victim funds.

79. Moreover, tracing shows that Defendants' infrastructure remained active after the Victim's losses were incurred, and continued to receive and move cryptocurrency in a manner consistent with ongoing fraudulent activity. This pattern indicates a threat of continued criminal conduct absent judicial intervention.

80. The existence of multiple victims, repeated transactions, and the reuse of the same laundering and pooling mechanisms confirms that Defendants' scheme was designed to operate indefinitely and to extract cryptocurrency from additional victims over time.

## IX. Causes of Action

81. Plaintiff brings the following causes of action against the Defendants. The allegations set out above are incorporated into each of the causes of action that follow as if fully restated therein.

### COUNT ONE
### RACKETEERING IN VIOLATION OF 18 U.S.C. § 1964(C)
### AGAINST ALL DEFENDANTS

82. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

#### A. The RICO Enterprise

83. At all relevant times, Defendants Ava Lee, Onchainweb3, and the Off-Ramp Defendants were associated with an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

84. The Enterprise consisted of a group of individuals and entities associated in fact for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims, laundering the proceeds, and consolidating and enjoying the fraud proceeds.

85. The Enterprise had relationships, longevity, and structure sufficient to permit its members to pursue the Enterprise's purpose. Defendants performed distinct but complementary roles pursuant to an agreed-upon division of labor, including grooming victims, operating a fraudulent trading platform, laundering proceeds through exchange off-ramps, and consolidating assets in pooling addresses.

### B. Interstate Commerce

86. At all relevant times, the activities of the Enterprise affected interstate and foreign commerce, including through the use of interstate wire communications, internet-based messaging platforms, cryptocurrency networks, and centralized cryptocurrency exchanges operating in or affecting the United States.

### C. Conduct or Participation in the Enterprise's Affairs

87. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

88. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

89. Ava Lee conducted the Enterprise's affairs by initiating and maintaining communications with the Victim, making fraudulent misrepresentations, cultivating trust through fabricated identities, and

inducing the Victim to transfer cryptocurrency pursuant to the Enterprise's scheme.

90. Onchainweb3 conducted the Enterprise's affairs by operating and controlling the fraudulent trading platform that simulated investment activity, displayed fabricated profits, and reinforced the misrepresentations used to induce additional cryptocurrency transfers. Onchainweb3 knowingly provided the technical infrastructure necessary to sustain the illusion of legitimate investment activity.

91. The Off-Ramp Defendants conducted the Enterprise's affairs by knowingly and affirmatively agreeing to serve as a laundering and off-ramp conduit for fraud proceeds. The Off-Ramp Defendants agreed with other members of the Enterprise to receive stolen cryptocurrency into centralized exchange accounts and to convert, withdraw, and transfer those assets in furtherance of the scheme.

92. The Off-Ramp Defendants' roles were not passive or incidental. By agreeing to place exchange accounts at the disposal of the Enterprise, knowingly receiving large volumes of fraud proceeds, and executing conversions and withdrawals consistent with laundering activity, the Off-Ramp Defendants exercised discretion, judgment, and control that furthered the Enterprise's objectives and enabled the laundering and monetization of stolen assets.

### D. Pattern of Racketeering Activity

93. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

94. These predicate acts included, without limitation, the transmission of fraudulent representations via interstate wire communications, the use of interstate wires to direct victims to transfer cryptocurrency, the operation of a fraudulent trading platform through internet-based systems, and the use of interstate wires to move, convert, launder, and consolidate fraud proceeds.

95. The racketeering acts were related, as they shared common purposes, victims, methods, and participants, and they amounted to or posed a threat of continued criminal activity.

96. The racketeering acts constituted closed-ended continuity, as they occurred over a substantial period of time, and open-ended continuity, as the scheme was inherently capable of repetition and posed a continuing threat to additional victims.

### E. Proximate Cause and Damages

97. Defendants' violations of 18 U.S.C. § 1962(c) were the direct and proximate cause of Plaintiff's injuries, including the loss of cryptocurrency assets transferred in reliance on Defendants' fraudulent conduct.

98. As a result of Defendants' RICO violations, Plaintiff suffered concrete financial losses, including but not limited to the value of

misappropriated cryptocurrency, lost investment capital, and related damages.

### F. Vicarious and Joint Liability

99. Each Defendant is jointly and severally liable for the acts of the other Defendants committed in furtherance of the Enterprise's affairs.

100. Defendants are also liable under principles of vicarious liability, aiding and abetting, and respondeat superior, as applicable.

### G. Statute of Limitations Tolling

101. Defendants concealed the existence of the Enterprise and the fraudulent nature of their conduct through fabricated platforms, false identities, and deliberate obfuscation of asset flows, thereby tolling the statute of limitations under principles of fraudulent concealment.

### H. Relief

102. Plaintiff seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, attorneys' fees, and appropriate equitable relief.

## COUNT TWO
## RACKETEERING CONSPIRACY - 18 U.S.C. § 1964(D)
## AGAINST ALL DEFENDANTS

103. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

104. Defendants Ava Lee, Onchainweb3, and the Off-Ramp Defendants knowingly agreed and conspired to conduct and participate,

directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

105. Each Defendant knowingly agreed that a member of the conspiracy would commit at least two acts of racketeering activity constituting wire fraud, money laundering, or related offenses, and each Defendant agreed to perform a specific role in furtherance of the Enterprise's unlawful objectives.

106. The conspiracy was formed for the common purpose of defrauding victims through pig-butchering cryptocurrency investment schemes, extracting cryptocurrency from victims through fraudulent means, laundering and off-ramping the proceeds, and consolidating and enjoying the fraud proceeds.

107. In furtherance of the conspiracy, Ava Lee agreed to initiate and maintain deceptive communications with victims, to make material misrepresentations, and to induce victims to transfer cryptocurrency pursuant to the scheme.

108. In furtherance of the conspiracy, Onchainweb3 agreed to operate and control a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated profits, and reinforce the misrepresentations used to induce additional transfers.

109. In furtherance of the conspiracy, the Off-Ramp Defendants agreed to provide exchange accounts under their control for the purpose of

receiving, converting, withdrawing, and transferring the proceeds of fraud, with knowledge that such accounts would be used to launder cryptocurrency derived from victim losses.

110. Each Defendant knew the essential nature of the plan and knowingly agreed to facilitate the scheme by performing acts that were necessary or advantageous to the Enterprise's success, even if each Defendant did not personally commit every racketeering act.

111. The conspiracy contemplated and resulted in the commission of multiple overt acts, including the use of interstate wire communications, the operation of fraudulent online infrastructure, the transfer of cryptocurrency through blockchain networks, and the laundering and consolidation of fraud proceeds.

112. Plaintiff was injured in Plaintiff's business or property by reason of the Defendants' agreement to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, entitling Plaintiff to relief under 18 U.S.C. § 1964.

## COUNT THREE
## CONVERSION – TEXAS COMMON LAW
## AGAINST ALL DEFENDANTS

113. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

114. At all relevant times, Ava Lee, Onchainweb3, and the Off-Ramp Defendants knowingly participated in a common plan and scheme to defraud the Victim through a pig-butchering cryptocurrency investment scam.

115. In furtherance of the scheme, Ava Lee made material misrepresentations and omissions to the Victim, including false statements regarding Ava Lee's identity, experience, and intentions; the legitimacy of the purported trading platform operated by Onchainweb3; the existence of real trading activity and profits; and the Victim's ability to withdraw funds.

116. These misrepresentations were false when made and were known to be false by Ava Lee at the time they were made. They were communicated with the intent to induce the Victim to rely on them and to transfer cryptocurrency pursuant to the scheme.

117. Onchainweb3 knowingly participated in and furthered the fraud by operating and controlling a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated account balances and profits, and reinforce the misrepresentations communicated to the Victim. Onchainweb3 knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

118. The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. They knew that the assets received through

these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

119. Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

120. The Victim reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

121. As a direct and proximate result of Defendants' fraudulent conduct, the Victim suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FOUR
## FRAUD – TEXAS COMMON LAW
## AGAINST ALL DEFENDANTS

122. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

123. At all relevant times, Ava Lee, Onchainweb3, and the Off-Ramp Defendants knowingly participated in a common plan and scheme to defraud the Victim through a pig-butchering cryptocurrency investment scam.

124. In furtherance of the scheme, Ava Lee made material misrepresentations and omissions to the Victim, including false statements

regarding Ava Lee's identity, experience, and intentions; the legitimacy of the purported trading platform operated by Onchainweb3; the existence of real trading activity and profits; and the Victim's ability to withdraw funds.

125. These misrepresentations were false when made and were known to be false by Ava Lee at the time they were made. They were communicated with the intent to induce the Victim to rely on them and to transfer cryptocurrency pursuant to the scheme.

126. Onchainweb3 knowingly participated in and furthered the fraud by operating and controlling a fraudulent trading platform designed to simulate legitimate investment activity, display fabricated account balances and profits, and reinforce the misrepresentations communicated to the Victim. Onchainweb3 knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

127. The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. The Off-Ramp Defendants knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

128. Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud.

Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

129. The Victim reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

130. As a direct and proximate result of Defendants' fraudulent conduct, the Victim suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FIVE
## UNJUST ENRICHMENT/RESTITUTION – TEXAS COMMON LAW
## AGAINST ALL DEFENDANTS

131. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

132. Defendants Ava Lee, Onchainweb3, and the Off-Ramp Defendants each received benefits at the expense of the Victim, including cryptocurrency assets and proceeds thereof that were misappropriated through fraud and deception.

133. Defendants knowingly accepted, retained, used, or controlled these benefits, either directly or indirectly, as part of the coordinated scheme described herein.

134. Defendants' receipt and retention of the Victim's cryptocurrency was unjust and inequitable because the assets were obtained through

wrongful conduct, without lawful consideration, and in violation of the Victim's rights.

135. Equity and good conscience require restitution of all benefits unjustly obtained by Defendants, including the return of misappropriated cryptocurrency and any proceeds derived therefrom.

136. Defendants hold such assets in constructive trust for the benefit of the Victim and must disgorge all unjust enrichment obtained as a result of their conduct.

## COUNT SIX
## CIVIL CONSPIRACY - TEXAS COMMON LAW
## AGAINST ALL DEFENDANTS

137. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

138. Defendants Ava Lee, Onchainweb3, and the Off-Ramp Defendants knowingly agreed and conspired with one another to commit unlawful acts, including fraud, conversion, and related wrongful conduct, or to commit lawful acts by unlawful means.

139. Each Defendant knew of the essential nature and scope of the conspiratorial plan and agreed, expressly or tacitly, to participate in and further the scheme by performing a specific role within a coordinated division of labor.

140. In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to:

a. Making material misrepresentations to induce cryptocurrency transfers;

b. Operating fraudulent investment infrastructure;

c. Receiving, laundering, off-ramping, pooling, and retaining fraud proceeds;

d. Concealing the source and movement of misappropriated assets.

141. Defendants' acts were interdependent and mutually reinforcing, and each Defendant benefitted from the conspiracy by receiving or controlling proceeds derived from the unlawful conduct.

142. As a direct and proximate result of Defendants' conspiratorial conduct, the Victim suffered substantial damages, including the loss of cryptocurrency assets.

143. Each Defendant is jointly and severally liable for all damages caused by the acts of any co-conspirator committed in furtherance of the conspiracy.

## COUNT SEVEN
## MONEY HAD & RECEIVED – TEXAS COMMON LAW
## AGAINST ALL DEFENDANTS

144. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

145. The Off-Ramp Defendants received money and/or cryptocurrency assets that belonged to the Victim and were wrongfully obtained through fraud and conversion.

146. The assets received by the Off-Ramp Defendants were traceable to the Victim's transfers and were accepted with knowledge, or willful blindness, that the assets constituted proceeds of unlawful activity.

147. The Off-Ramp Defendants retained, controlled, or used these assets for their own benefit or for the benefit of the fraudulent scheme.

148. In equity and good conscience, the Defendants should not be permitted to retain the Victim's property, and restitution is required.

149. Plaintiff is entitled to recover from Defendants the full amount of money and cryptocurrency had and received, together with interest and other equitable relief.

## X. Relief Sought

150. Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and jointly and severally against Defendants Ava Lee, Onchainweb3, and the Off-Ramp Defendants and grant the following relief:

### A. Injunctive and Equitable Relief

151. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, their agents, employees, co-conspirators, and all persons acting in concert with them from directly or indirectly:

a. Engaging in pig-butchering schemes or similar fraudulent conduct;

b. Soliciting or inducing cryptocurrency transfers through misrepresentation or deception;

c. Transferring, dissipating, concealing, converting, or otherwise disposing of assets traceable to the scheme.

d. An order freezing all cryptocurrency, fiat currency, accounts, wallets, exchange accounts, and other assets owned by, controlled by, or traceable to Defendants that are derived from or connected to the fraudulent scheme.

e. An order authorizing expedited discovery, including but not limited to subpoenas directed to cryptocurrency exchanges, custodial service providers, financial institutions, and other third parties, for the purpose of identifying, tracing, and preserving assets and identifying additional participants in the scheme.

f. An order requiring Defendants to provide a full accounting of all cryptocurrency, fiat currency, wallets, exchange accounts, and other assets received, transferred, converted, or controlled in connection with the scheme.

g. An order imposing a constructive trust over all cryptocurrency, fiat currency, exchange accounts, wallets,

and other assets that are traceable to the fraudulent scheme, including assets held by Defendants or by third parties for Defendants' benefit.

h. An order directing any cryptocurrency exchange, custodial service, or financial institution holding assets subject to the constructive trust to preserve such assets and, upon further order of the Court, to transfer or release such assets to the Victim.

**B. RICO Remedies (18 U.S.C. § 1964)**

152. Treble damages pursuant to 18 U.S.C. § 1964(c) for injuries sustained by Plaintiff as a result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d).

153. An order disgorging all ill-gotten gains obtained by Defendants as a result of the racketeering activity.

154. An order imposing a constructive trust over all assets traceable to the racketeering enterprise.

155. An award of costs, expenses, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**C. Compensatory and Restitutionary Relief**

156. Compensatory damages in an amount to be proven at trial for all losses suffered by Plaintiff, including but not limited to the value of misappropriated cryptocurrency and related financial harm.

157. Restitution of all cryptocurrency and other assets wrongfully taken from Plaintiff.

158. Pre-judgment and post-judgment interest as permitted by law.

**D. Declaratory Relief**

159. A declaration that Defendants' conduct violated federal RICO statutes and common law governing fraud and conversion.

160. A declaration that Plaintiff is entitled to recover assets traceable to the fraudulent scheme from Defendants and any third parties holding such assets for Defendants' benefit.

161. A declaration that Defendants possess no lawful ownership interest in assets traceable to the scheme and that such assets are held in equity for the Victim.

**E. Additional Relief**

162. An order appointing a receiver or special master, if necessary, to identify, marshal, manage, and preserve assets subject to this action.

163. Such other and further relief as the Court deems just and proper.

## XI. Jury Demand

164. Plaintiff demands a trial by jury on all claims so triable.

Dated: March 11, 2026

Respectfully submitted,

CYBERJUSTICE LAW GROUP

Marshal J. Hoda, Esq.
Tx. Bar No. 2411009
Alexander Crous, Esq.
Tx. Bar No. 24136488
3120 Southwest Fwy
Ste. 101 PMB 51811
Houston, TX 77098
o. (832) 838-0036
marshal@cyberjustice.law
alex@cyberjustice.law

*Attorneys for Plaintiff*